O’NIELL, C. J.
 

 The appellant stands convicted of murder and sentenced to suffer the penalty of death. This is the second time he was convicted of the same crime and sentenced to be hanged. The first conviction and sentence were set aside, on appeal, and the case was remanded to the district court for a new trial, to be had after the appointment of another attorney at law to defend the accused, and after giving him an opportunity to submit evidence on his motion for a change of venue. State v. Jones, 174 La. 1074, 142 So. 693. The case being remanded, the district judge appointed four members of the bar, other than the one originally appointed, to defend the accused. Evidence was heard on the motion for a change of venue, and, after due consideration, the motion was overruled. The attorneys for the defendant did not take exception to the ruling; hence we infer that it was manifestly correct.
 

 The record contains two bills of exception. The first bill was reserved to the overruling of a challenge of a tales juror for cause. On his voir dire examination, the talesman said that, from the newspaper reports, he had formed an opinion of the guilt of the defendant; and then, misunderstanding the questions put to him by the defendant’s counsel with regard to the presumption of innocence, and the duty of the jury to give the defendant the benefit of any and all reasonable doubt, the tales juror answered that he would require the defendant to produce evidence to overcome the opinion which he (the talesman) had formed; and, in answer to another question, he said that he would give the defendant the benefit of the presumption of innocence if he could prove his innocence. Answering another question — rather long and complicated — as to whether the juror could give the defendant the benefit of the doubt on the question of malice vel non, and find him guilty of manslaughter, if the evidence should leave a reasonable doubt as to whether the killing was done maliciously, but leave no doubt that the defendant did the killing willfully, the tales juror answered and repeated that he would not give the defendant
 
 *1017
 
 the benefit of that doubt if the state proved that he fired the fatal shot.
 

 The juror was evidently embarrassed by the ordeal which he was being subjected to, and the surroundings, which perhaps he was not accustomed to. His thoughts became composed very readily, however, and he immediately corrected his mistakes by answering promptly and intelligently every question that was asked of him. We quote now the appropriate part of the voir dire examination, including all of the expressions which counsel for appellant quote in their brief and rely upon for a reversal of the verdict and sentence, viz.:
 

 “By Mr. Kizer [counsel for defendant]: Q. A moment ago you answered a question of the district attorney. He asked you if the fact that this was a negro being tried for killing an officer — did that create a prejudice in your mind? Didn’t I understand you to say: ‘Not particularly?’
 

 “A. I said it would not.
 

 “Q. Then you do not have any prejudice against this man?
 

 “A. No.
 

 “Q. Could you give him the same fair and impartial trial as you would a white man under similar circumstances?
 

 “A. Yes.
 

 “Q. Does the fact that the grand jury has indicted this man create a presumption of guilt in your mind?
 

 “A. In my mind, the reports that I got from the paper, I feel that he is. I formed an opinion to that effect.
 

 “Q. Would you require him.to produce evidence to disprove that opinion?
 

 “A. Sir?
 

 “Q. Would you require him to produce evidence to disprove that opinion?
 

 “A. Yes.
 

 “By Mr. Kizer: We submit that this juror is an incompetent juror.
 

 “By the Court: Q. Mr. Evans, have you formed or expressed an opinion?
 

 “A. Yes. I have formed an opinion.
 

 “Q. Is that a fixed opinion?
 

 “A. No, sir.
 

 “Q. Is that an opinion that would yield readily to the law and the evidence?
 

 “A. Yes.
 

 “Q. Could you go in the jury box and base your verdict solely and entirely on the testimony of the witnesses you will hear on this witness stand?
 

 “A. Yes.
 

 “By the Court: I think he is a competent juror.
 

 “By Mr. Kizer:
 

 “Q. You have an opinion even though it is not a fixed opinion. The presumption of law is that this man is innocent until proved guilty. In view of the circumstances which you have related, do you feel that you can give the accused the benefit of that presumption?
 

 “A. How is that?
 

 “Q. I say, under the law, this accused is presumed to be innocent until proven guilty. You have just told the court that you have an opinion. In spite of that opinion, you think you can go in the jury-box and give the ac
 
 *1019
 
 cused the benefit of the presumption that he is innocent until proven guilty?
 

 “A. Yes. If he can prove he is innocent, I would give him the benefit of it.
 

 “Q. Would you require him to prove his innocence?
 

 “A. No. They got to prove him guilty. If they cannot prove him guilty I would giVe him the benefit of the doubt.
 

 “Q. The court will instruct you as to the elements which constitute murder, and you are to take the law from the court, and decide this case on the facts as you hear them from the witness stand. Even though it might be proven in this case that this accused actually fired the shot that killed Frank Schoonmaker, in order to constitute murder there must be malice, either expressed or implied. If there was a doubt in your mind as to that malice being present, either expressed or implied, and this man actually fired the shot that killed Frank Schoonmaker, could you give this accused the benefit of that doubt and bring in a lesser verdict than murder?
 

 “A. If they could actually prove that, he fired the shot that killed him ?
 

 “Q. Yes, but there was a reasonable doubt in your mind as to whether all the elements that constitute murder,- — if there was doubt in your mind as to the malice, would you give the accused the benefit of that doubt and bring in a verdict less than murder?
 

 “A. No; not if they prove that he fired the fatal shot.
 

 “By the Court: I do not think the juror understands the question. The court is going to charge you that homicide is either murder, which is the killing with malice aforethought, either expressed or implied, or manslaughter, or excusable or justifiable. If the-testimony, in your opinion, is such that there is a doubt in your mind as to whether the killing constituted murder, could you and would you give the accused the benefit of the-doubt and find him guilty of a lesser offense?:
 

 “A. Yes.
 

 “By the Court: I think he is qualified.
 

 “By Mr. Pearce [counsel for the defendant] : Q. Mr. Evans, if, after hearing all the testimony in this case, the State does prove that Buce Jones fired the shot that killed. Frank Schoonmaker, but there was in your mind a doubt as to whether all the elements were there necessary to constitute murder, could you and would you bring in a verdict, less than murder?
 

 “A. I would.
 

 “Q. You would do that?
 

 “A. Yes.
 

 “Q. You have not any prejudice against the negro race, have you?
 

 “A. No.
 

 “Q. Do you know of any reason at all why you would not make a fair and .impartial juror in this case?
 

 “A. No, sir, I do not.
 

 “Q. Did you contribute, to the Frank Schoonmaker Memorial Fund?
 

 “A. No, sir.
 

 “Q. Did your company do that?
 

 “A. I really-could not say whether It did' or not.
 

 “Q. If it did, you don’t know anything about it?
 

 
 *1021
 
 “A. No, sir.”
 

 At this stage counsel for the defendant repeated that he challenged the juror for cause; and the district attorney, perhaps t® do away with any possible ground for a bill of exceptions, said: “I agree to excuse him by consent.” Counsel for the defense did not accept the offer to have Mr. Evans excused from jury service, by mutual consent, but insisted upon challenging the juror for cause. The judge said that he thought the juror was qualified, but that he would make that clear, meaning that he would examine the juror; whereupon the district attorney withdrew his offer to have the juror excused by mutual consent. The judge then proceeded to examine the juror, thus: “By the Court: Q. Would the opinion that you have yield easily and readily to the law and the evidence that you hear in this case?
 

 “A. Yes.
 

 “Q. Could you and would you base your verdict solely upon the testimony that you hear during this trial?
 

 “A. Yes.
 

 “Q. Could you and would you utterly disregard your opinion?
 

 “A. I would.
 

 “Q. After the court charges you what constitutes murder, what constitutes manslaughter, if, after hearing the testimony, you have a doubt as to whether the State has or has not proven him guilty of murder, could you give him the benefit of that doubt and convict him of a lesser offense?
 

 “A. Yes:”
 

 The judge then ruled that Mr. Evans was a competent juror. Counsel for the defense am nounced that they had decided to agree that Mr. Evans should be excused by mutual consent. The district attorney said: “That offer was withdrawn.” Counsel for the defendant asked that their acceptance of the district attorney’s offer be noted on the minutes of the court; and they then insisted upon their challenge of the juror for cause, which was overruled.
 

 The ruling was correct. The mistakes which the juror made in some of his answers on the voir dire examination, concerning the presumption of innocence and the duty of the jury to give the defendant the benefit of any reasonable doubt, were, manifestly, caused by embarrassment and misunderstanding, and did not reflect the mental attitude of the juror in that respect. The voir dire examination, as a whole, showed that Mr. Evans was qualified to serve on the jury. We who are accustomed to courtroom scenes and judicial proceedings can hardly realize how embarrassing it must be to a layman, not accustomed to such scenes or proceedings, to have to undergo the ordeal of a public examination on questions of law and on his mental attitude towards questions which he believes the questioner and those surrounding him have superior knowledge. The qualifications of a person to serve on the jury in any ease must be determined from the whole of the voir dire examination, and not from excerpts of answers which, standing alone, would disqualify the person for jury service.
 

 We cannot understand why the defendant’s counsel declined the district attorney’s offer to have Mr. Evans excused from serving on the jury, by mutual consent, unless they thought more of the prospect of having a
 
 *1023
 
 good bill of exception than they thought of excluding Evans from the jury. We do not see how it could have been advantageous to the defendant to have Evans excluded from the jury by means of a challenge for cause, instead of having him excused by mutual consent. The district atotrney had the right to withdraw his offer to have Evans excused by mutual consent from serving on the jury, after the defendant’s counsel had declined the offer and insisted upon their challenge for cause.
 

 Our conclusion is that there is no merit in the appellant’s first bill of exception.
 

 The second bill whs reserved to the overruling of an objection to proof of a confession or admission of' the killing, made by the defendant while he was under arrest. The objection was, first, that the confession or admission was not a free and voluntary one; and, second, that it was not really the confession or admission of the defendant, Buce Jones, but a statement by his companion, Henry Joiner, who was with him at the time of the killing. The objection that the confession or admission was not free or voluntary is not argued in the brief for the appellant, and seems to be abandoned. There is no merit in it. No punishment was inflicted, or threat made, or reward given, or promise of reward made, or other inducement offered to the defendant, when he made the admission, or at any time before. On the night of the arrest of Jones and Joiner, which was the night of the killing, and was the night before the confession or admission was made, Jones was questioned by three police officers and the sheriff. Jones sat on a cot in his cell, turning the pages of a magazine and looking at the pictures, instead of looking up at his questioners or paying attention to them. The police captain, who was questioning Jones, considered the seeming indifference as impudence on the part of Jones, and said: “G-.d- you, put that magazine down and look at me.” They were the only harsh words used by any one at any time during the questioning of Jones or Joiner; and it is quite certain that that harshness did not induce the statement made by Jones, because he made no statement that night. The statement was made on the following night, freely and voluntarily; the reason given by Jones for admitting that he did the killing being that he wished to protect Joiner against punishment for the killing which he (Jones) had done. The two prisoners were in separate cells when each expressed a desire to tell how the killing occurred. The statement which they intended to make, and which in fact they did make, was not a confession of the crime of murder, on the part of either of them, because the statement was that Joiner had nothing to do with the killing, and that Jones did it under the belief that the police officer Who had ordered them to hold up their hands, and who was about to search Joiner, when Jones shot him, was a highwayman, attempting to rob them. When each of the prisoners expressed a willingness to tell how the killing occurred, Joiner was brought into Jones’ cell; and the chief of police, who brought Joiner into Jones’ cell, pointed to the district attorney and his assistant, who were present, and said to Jones and Joiner: “Here is the district attorney and' the assistant district attorney, who will prosecute you in a trial by a jury for this crime.” Then, referring to the other police officers present, and a female news
 
 *1025
 
 paper reporter, the chief of police said: “These men here are officers of the law, and this is a newspaper reporter; and everything that you say will be held against you.” Then the chief of police asked the two prisoners if any promise had been made to them; to which ’ each answered, “No” ; and. then he asked if they were forced to talk; to which each answered, “No.” Then Jones said that he wanted to confess, because he did not want Joiner to suffer for something that he (Jones) had done. Joiner then related the story of the killing, and Jones affirmed all that Joiner said, except that, when Joiner said that he thought that Jones had fired twice and the police officer once, Jones corrected Joiner by saying that the police officer did not fire at all, but that he (Jones) fired twice. As Joiner related the story of the killing, the chief of police turned to Jones, now and then, and asked, “Is that right, Jones,” and Jones replied, “Yes, that is right.” Jones finally stood behind Joiner and demonstrated how he shot the officer from behind Joiner, when Joiner had both hands stuck up, and he (Jones) had only his left hand up. The crime which both men confessed was the crime of robbery, which they had committed about fifteen or twenty minutes before the killing, and for which the police officer whom Jones killed was arresting him and Joiner. The latter was not a party to the crime of murder. He pleaded guilty of the crime of robbery, and was sentenced to imprisonment in the penitentiary. He testified as a witness for the state in the prosecution of Jones for murder.
 

 Before the evidence of the admission of the killing by Jones was given bo the jury, the judge instructed, the jury to consider as evidence in the case only the statements made by Jones, and such statements made by Joiner as were specifically affirmed by Jones, but not to consider as evidence in the ease any statement made by Joiner unless it was specifically affirmed by Jones at the time it was made. Under those instructions, the testimony of those who heard the story of the killing related by Joiner and Jones jointly, though principally by Joiner, was admissible.
 

 The verdict and sentence are affirmed.